FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA** 03 JUL 25 PM 2:49
**EASTERN DIVISION**

U.S. DISTRICT COURT
N.D OF ALABAMA

BILLY RENEE BAILEY,            )
                              )
    Plaintiff,            )
                              )
v.                            )        Civil Action No.: 01-PT-3047-E
                              )
CLAY COUNTY, ALABAMA;         )
RALPH TOLAND, et al.,         )
                              )        **ENTERED**
    Defendants.            )
                              )        JUL 25 2003

## MEMORANDUM OPINION

This cause comes on to be heard upon defendants Clay County, Alabama ("Clay

County"), and Ralph Toland's ("Toland") Motion for Summary Judgment (Doc. 85), filed on

May 21, 2003.

## FACTS AND PROCEDURAL HISTORY[1]

Toland was at all relevant times the Sheriff of Clay County, Alabama. Plaintiff Billy

Renee Bailey ("Bailey") was incarcerated at the Clay County Jail ("the Jail"). This lawsuit

surrounds Bailey's incarceration in the Jail beginning on November 30, 1999. *See* Def. Ex. 15.

Bailey was released on January 18, 2000. Bailey alleges violations of 42 U.S.C. § 1983 as a

result of unconstitutional conditions at the Jail and denial of medical care while incarcerated.[2]

## I. Conditions with Respect to the Facility Itself

The Jail Facility

The Jail, located in Ashland, Alabama, was constructed in 1948. Defendants note that

---

[1]The statement of facts and the summary of the parties' arguments may overlap somewhat.

[2]The Defendants address each purported condition individually, and the court will do the same.

110

extensive renovations were done at the Jail in 1986, including the addition of new kitchen and food storage areas, additional jail space, and a trustee dormitory. More renovations were made between 1991 and 1995, during Toland's administration. Throughout the years, general maintenance (painting, replacement of fixtures, etc.) had been done on a continual basis. Defendants specifically note that the entire jail, including the showers, was painted approximately twice a year. *See* Def. Ex. 1 at ¶ 17; Ex. 3 at ¶ 9.

As you enter the Jail through the office, the Booking Room is on the right, and passed that is the trustee bathroom and dormitory. On the left side are the stairs leading down to the basement where the laundry room, boiler room, and storage room are located. After the stairs, the next door on the left is Cell #1, followed by Cell #2, Cell #3, and the Holding Cell. The Holding Cell, referred to as the "hole" or the "drunk tank," is used for high security inmates and potentially suicidal inmates. Cell #1 is a large cell used to house female inmates. Bailey was in Cell #1 during her incarceration. Cell #1 has two bunk beds, a shower, a toilet, and a sink. There is a catwalk behind the cell and a large window on the other side of the catwalk. *See* Def. Ex. 3 at ¶ 23.

Bailey alleges that the walls and floors had peeling paint. *See* Def. Ex. 24 at 102. Defendants counter that this condition existed primarily in the upstairs portion of the Jail and in the kitchen, not in Bailey's cell. *See* Def. Ex. 5 at ¶ 21; Ex. 12. Bailey stated that she desired to be in a "more sterile place." *See* Def. Ex. 24 at 121. She was also bothered by the smell of sewage which came up through the drain pipes, and dust which was everywhere. *Id.* at 127. Bailey also observed mold in the floor of the shower. *Id.* at 155. Bailey admits that she was given Clorox and Comet to work on the mold, but she contends that she was unable to get the

2

mold off of the floor. *Id.* at 155-56.

Defendants contend that plumbers were called to fix the leak that was coming from upstairs into the light fixture, and that they fixed the leak. *See* Def. Ex. 2 at 72-73, 88-89; Ex. 1 at ¶ 17. When the jail staff needed something done at the jail or supplies were needed, especially cleaning supplies, the county commission would take care of it, even if they went over budget. *See* Def. Ex. 2 at 33; Ex. 1 at ¶ 17. Despite Bailey's assertions to the contrary, *see* Def. Ex. 24 at 129-30, defendants contend that Rusty Miller ("Miller"), the Clay County Department of Health Senior Public Health Environmentalist, has never condemned the Jail, as he does not have the power to do so. Nor has he ever told anyone that the Jail has been or should be condemned. *See* Def. Ex. 5 at ¶ 7. Defendants also assert that Toland has never been told that the Jail had been or was to be condemned. *See* Def. Ex. 1 at ¶ 7. Toland and Miller worked to make some cosmetic changes during health inspections, and Miller indicated to Toland that the Jail was in good shape considering its age. *Id.* at ¶ 18.

Jail Administration, Policies, and Procedures

Toland had no personal participation in the day to day operation or activities of the Jail. *See* Def. Ex. 1 at ¶ 15. Toland appointed a Jail Administrator, Jim Studdard ("Studdard"), to oversee the daily functioning and operation of the Jail. *Id.*; Def. Ex. 3 at ¶ 4. At the time Studdard became Jail Administrator, there was in place a Standard Operating Procedure which was given to all jailers for their review. *See* Def. Ex. 3 at ¶ 3; Ex. 11. A copy was also kept at the Jail at all times. *See* Def. Ex. 3 at ¶ 3. The policies and procedures were approved by Toland, and all policies, specifically with regard to medical care, were made know to Studdard and were to be implemented and overseen by him. *See* Def. Ex. 1 at ¶ 15. Toland asserts that he

3

did not know of Bailey's complaints about the conditions at the Jail until he received a copy of the complaint. Toland never received a complaint from Bailey, *see* Def. Ex. 1 at ¶ 3, and Bailey admitted that she never talked to Toland. *See* Def. Ex. 23 at 54, 152-53.

Pest Control at the Jail

Bailey stated that while she was at the Jail she was bitten by a spider and that it caused swelling. *See* Def. Ex. 24 at 77-78. However, Defendants note, on the day that she was released, Bailey was examined by a Dr. Schuster but did not complain about the bite. *Id.*; Def. Ex. 18. Bailey stated that she did not complain because she thought that antibiotics that she had been given for the flu were helping with the bite as well. *See* Def. Ex. 24 at 77-78. Staff at the Jail did come to Bailey's cell and attempted to remove the spiders, although the spiders eventually returned. *Id.* at 104. Bailey also claims to have been bitten by roaches, although again she did not complain of this to Dr. Schuster. *Id.* at 103; Ex. 18. Bailey also contends that three weeks before her release she contracted head lice. *See* Def. Ex. 24 at 79. Defendants counter that head lice is not indicative of poor jail conditions, noting that Bailey admitted that she had previously suffered from head lice when she was twenty-one. *See* Def. Ex. 23 at 67.

Defendants also note that Superior Pest Control ("Superior") is under contract to provide pest control services at the Jail. Superior has provided these services on a monthly basis for over a decade. Superior also services the Jail between the regularly scheduled service dates if there is a problem. Toland contends that he never received a complaint about pest problems at the Jail. *See* Def. Ex. 1 at ¶ 8; Ex. 2 at 29, 134; Ex. 3 at ¶ 17; Ex. 4 at ¶ 4. Ray Milstead, owner and operator of Superior, stated that efforts are made to eliminate pest problems at the Jail. *See* Def. Ex. 6 at ¶ 3. To the best of his knowledge, there is no significant pest problem at the Jail

4

compared to buildings of a similar size housing large numbers of people. *Id.* at ¶ 4. *See also* Def. Motion at 9-10; Def. Ex. 7 at ¶¶ 3-6 (detailing efforts made to control pests at the Jail). Miller stated that he has never known of a rampant pest problem. *See* Def. Ex. 5 at ¶ 8. Miller admitted to seeing roaches on occasion, but would not classify the problem as significant or epidemic. *Id.* Clay County Administrator Lou Ann Hanners also stated that she has not received any complaints from Superior, any member of Toland's staff, or any inmate about a significant pest problem. *See* Def. Ex. 4 at ¶ 4. Hanners also stated that she has never known of a time in which Toland of his staff has refused to address a problem concerning pest control at the Jail. *Id.*

Plumbing and Electrical Maintenance and/or Repair

Robert Pesnell ("Pesnell"), is in charge of operation for Tri-City Plumbing. From July 1999 to November 2000, Pesnell serviced the Jail's plumbing system on several occasions. Pesnell stated that it is his belief that the Jail staff never hesitated to call him for help to repair or improve the plumbing system. *See* Def. Ex. 8 at ¶¶ 3, 4. Pesnell denies that he was ever told to simply "patch" a problem or that cost was an issue. Rather, he was told to make any and all needed repairs. Pesnell stated that in his opinion the plumbing system was adequate and is maintained as best as is possible due to the Jail's age. *Id.* at ¶¶ 5, 6.

Similar statements were given by Kenneth Patterson ("Patterson"), who contracted with Clay County on a part-time basis to provide general maintenance and repairs at County facilities, including the Jail. Patterson provided electrical and plumbing work at the Jail. *See* Def. Motion at 11-12; Def. Ex. 9 (description or work performed by Patterson). Patterson stated that in all of his time working at the Jail, neither Toland nor his staff hindered his work, told him to cut corners, or refused to have problems replaced. *See* Def. Ex. 9 at ¶ 11.

5

Safety and Emergency Systems at the Jail

Matt Carpenter, Vice President and Field Manager of Safeguard Fire and Alarm, Inc., has serviced the Jail for eleven years.  Pursuant to an agreement with Clay County, Carpenter, or another technician, provides fire safety services at the Jail twice a year, including inspection of the fire alarm system, emergency exit/light system, etc.  Carpenter stated that he has never found a major problem with the systems, and that he has never had any problems with Toland or his staff concerning the upkeep of the systems.  *See* Def. Ex. 10 at ¶ 3.  More specifically, Patterson stated that he has never found a problem with water leaking into the fire alarm and emergency exit system.  Had there been a problem, it would have been corrected.  *Id.* at ¶¶ 4-5.  Bailey counters that there was water seepage into the electrical systems, a condition acknowledged by Toland as needing correction.  *See* Toland Depo. at 73.[3]

Weapons Problems at the Jail

Bailey asserts that material was allowed into the Jail from which weapons could be made and used, which caused her to suffer constant fear of harm from other inmates.  Toland counters that he knew of no weapons being made from materials at the Jail, as alleged by Bailey.  Toland's staff had not reported such weapons, *see* Def. Ex. 1 at ¶ 11, and according to defendants, Bailey did not state in her deposition that she ever saw such a weapon or that she was injured or threatened by such a weapon.  Defendants also note that the Jail staff conducted "shakedowns" of the inmates' cells to search for, among other things, such weapons.  *See* Def. Ex. 3 at ¶ 22.

---

[3]Toland did state that the problem was corrected.  *See* Toland Depo. at 73.

6

Overcrowding at the Jail

Bailey asserts that although the Jail was built to house 24 inmates, at the time of her incarceration the inmate population was averaging about 61 inmates per day.  She also contends that the overcrowding problem was reported by local news sources.  Defendants contend that Bailey herself admitted that often she only had one cellmate, and at times she had the entire cell to herself.  *See* Def. Ex. 23 at 124, 131.  At one point Bailey did have a cellmate that was present only on weekends.  *Id.* at 131-32.  At one point Bailey did mention sharing her cell with four or five other inmates, but that was apparently for one weekend only.  *See* Def. Ex. 24 at 106, 206-07.  With the exception of one evening in which Bailey was in a cell that had no bunk, she slept in her own bunk every night.  *Id.* at 205-06.  Bailey was given a mattress and sheets for her bed.  *Id.* at 179.  According to defendants, Bailey never attributed any injury to overcrowding during her deposition.  Defendants contend that the objective records from the Jail also show that there was no problem with overcrowding.  *See* Def. Motion at 14; Ex. 1 at ¶ 6.[4]

Cleaning at the Jail

Trustee inmates were responsible for cleaning the common areas throughout the Jail, which included hallways, catwalks, bathrooms, the office, kitchen, etc.  Trustees were provided with cleaning supplies with which to clean these areas.  *See* Def. Ex. 3 at ¶ 7; Ex. 1 at 47-48.  Jail policies required inmates to clean their own cells, rather than have the trustees do it for them.  Inmates were provided with cleaning supplies every other day, and more often if requested.  Inmates were told specifically to thoroughly clean their cells, and Studdard stated that he had seen inmates cleaning their shower curtains.  Studdard stated that shower curtains were replaced

_____

[4]Apparently, there was some overcrowding with respect to the male inmate population.  *See* Def. Motion at 15.

every three to six months or as needed, and as noted above, the shower itself was painted twice a year. *See* Def. Ex. 3 at ¶ 9. Studdard stated that he could not recall any specific complaint by Bailey regarding her shower or shower curtain. Had she made a complaint, she would have been furnished with cleaning supplies. *Id.* at ¶ 10. It was Studdard's duty to make sure that inmates were cleaning their cells. *See* Def. Ex. 1 at ¶ 14.

Bailey counters that the shower in her cell was so dirty that it could not be cleaned with customary cleaning material, and that the shower curtain was covered with mildew. *See* Def. Ex. 24 at 155-56.

Laundry Service at the Jail

Laundry service was performed by the trustees, who used the washer and dryer within the Jail to clean sheets, blankets, clothes, towels, etc. Laundry service was provided each day for any inmate who wished to use it. *See* Def. Ex. 3 at ¶ 11.

The Cat at the Jail

Bailey testified that a "dirty" cat was allowed to roam the jail and kitchen in order to kill mice. Once or twice the cat went into Bailey's cell, causing her to fear that she would have an allergic reaction. Toland contends that Bailey never complained about the cat to him. *See* Def. Ex. 23 at 140-41; Ex. 24 at 148. Bailey also admitted to having five cats of her own at her home. *See* Def. Ex. 24 at 157-58. Defendants admit that at one point a trustee inmate cared for a cat at the jail. However, the cat was not allowed to roam free, and as soon as Toland found out about the cat he ordered that it be removed from the premises. Toland was never told that the cat was allowed to linger inside the jail or in the kitchen area. *See* Def. Ex. 3 at ¶ 15; Ex. 1 at ¶ 9.

8

Use of Mace at the Jail

According to defendants, Bailey recounts only one incident of an inmate being maced. Bailey asserts that the fumes made it almost unbearable to remain in her cell. Defendants counter that after that inmate was maced, the jail staff allowed the other inmates, including Bailey, to go outside for fresh air. Bailey was asked if she wanted to go, but declined the offer. *See* Def. Ex. 23 at 133-34. Toland stated that he knew of no occasion where mace was used in the jail while Bailey was incarcerated. *See* Def. Ex. 1 at ¶ 12. Mace was kept on the premises, but the Jail staff was trained on how to use mace properly and how to ventilate the Jail in the event that mace was used. *See* Def. Ex. 3 at ¶ 21.

Department of Health Inspections

The Clay County Health Department, specifically Miller, inspects the Jail approximately four times per year. Mill personally inspects every area of the Jail, with the exception of the female cells. For the female cells, Miller talks with the inmates and inquires about their cells. If he receives any complaints, he notes them on the inspection form and deducts the appropriate number of points. *See* Def. Ex. 5 at ¶¶ 4-5. Deductions based on female complaints do not mean that the complaints are founded; rather, Miller simply notes them so that further action, if warranted, can be taken. *Id.* at ¶ 6. Miller notes that in his experience, all problems at the Jail have been promptly addresses by Toland and his staff. *Id.* at ¶ 9.

During the time of Bailey's incarceration, the Jail was inspected by Miller. *See* Def. Ex. 12. On the December 22, 1999 visit, the detention facility received a score of 64. However, defendants contend, the vast majority of point deductions had absolutely nothing to with the female cell where Bailey was incarcerated. *See* Def. Motion at 19-21. The only four areas that

9

could possibly have affected the female cell were plumbing maintenance (Section #6), presence

of insects (Section #13), laundry in good repair (Section #21), and mattress in good repair

(Section #26).  Miller could not recall any complaints by female inmates about laundry,

condition of mattresses, or insects.  Even assuming that these areas were affected, the score for

the female cells would have been 88, not 64.  *See* Def. Ex. 5 at ¶ 2; Ex. 12.

Despite the score, Miller could not recall any complaints about roaches or spiders, and

stated that the deduction for insects was "probably" for the presence of flies.  *See* Def. Ex. 5 at ¶

23; Ex. 12.  Miller did recall receiving a complaint about the shower in the female cell, although

he did not personally observe the problem.  The complaint was that the shower was rusty and

had mildew, not that it was inoperable.  The mildew could have been prevented by the inmates

cleaning the shower curtain.  *See* Def. Ex. 5 at ¶ 24.  Defendants also contend that several of the

deductions noted in previous inspections were repaired by the time of the December 1999

inspection, showing that Jail staff worked to correct any problems.  *See* Def. Motion at 22-23.[5]

Food at the Jail

Bailey described the food at the Jail as "inedible," and complained of the lack of variety.

*See* Def. Ex. 24 at 114-16.  Because she did not like what the Jail was serving, she at one point

simply quit eating until someone in the kitchen began to make her a different meal.  *Id.* at 118.

She eventually tired of that meal as well.  *Id.* at 119.  Bailey contends that another inmate

suffered food poisoning, but neither Toland nor Studdard have ever been made aware that this

had happened.  *See* Def. Ex. 1 at ¶ 13; Ex. 3 at ¶ 12.  Miller stated that he had not been made

---

[5]Defendants also assert that many of the deductions resulted from the Department of Health's technical definitions and regulations as opposed to problems at the jail.  For example, there would be a deduction because a male inmate did not have his own bunk, even though he slept on a mattress on the floor with sheets and blankets.

aware of an complaints of contaminated food being served or of food poisoning. *See* Def. Ex. 5 at ¶ 14.

The Jail's policy was to provide the inmates with three well-balanced meals each day. Trustees prepared the food, and were required to wear hairnets and gloves when doing so. All dishes were cleaned and placed in a high-steam sanitizer. *See* Def. Ex. 3 at ¶¶ 13-14. Cups were kept by inmates so that they could have a drinking cup throughout the day. Inmates were provided with soap and detergent to keep their cup clean. *Id.* at ¶ 15. When Miller inspected the kitchen in December 1999, it received a rating of 89, which defendants assert is acceptable. According to defendants, the few deductions that were taken had nothing to do with the Jail's food protection measures. *See* Def. Motion at 25. Defendants also note that the score of 89 was an improvement from the two previous inspections. *See* Def. Ex. 5 at ¶ 13; Exs. 12-14.

Snakes at the Jail

Apparently, Studdard would occasionally bring his snakes to the jail "just to play with." Bailey claims that Studdard would "terrorize" inmates with the snakes. However, defendants contend, Bailey admitted that she is not afraid of snakes and that Studdard has never tried to scare her with his snakes. Bailey even asked Studdard if she could see one of his more rare snakes. *See* Def. Ex. 23 at 140-42. Bailey never complained to anyone about the snakes. *See* Def. Ex. 24 at 149. Toland contends that he knew nothing about snakes being brought to the Jail. He had heard of an incident about a rubber snake prior to Bailey's incarceration, but that employee was told never to bring the rubber snake to the Jail again. *See* Def. Ex. 2 at 93; Ex. 1 at ¶ 10.

<u>Efforts to Build a New Jail</u>

In 1996, the Clay County Commission undertook to obtain funding for the building of a new jail, with such funding to come from additional court costs and increased gasoline and tobacco taxes. *See* Def. Ex. 34 at 70. The Commission also appointed a Blue Ribbon Committee to consider how to obtain funds for the building of a new jail. *See* Def. Ex. 4 at ¶ 6. The Alabama legislature eventually approved the additional court costs and gasoline tax increase, which were then imposed by the Commission. *Id.* at ¶ 7. A building was eventually purchased, and the new jail should completed by the end of July 2003. *Id.* at ¶ 8. Defendants contend that during this process, the provision of funds for ongoing maintenance at the existing Jail was budgeted as in previous years with increases in each budget. *See* Def. Ex. 34 at 109-10.

## II. Medical Care at the Jail

<u>The Jail's Medical Care/Medication Policies and Procedures</u>

The Jail's policy is to provide medical attention upon any inmate's written or verbal request. If it is an emergency situation, the inmate will be transported to the emergency room or the Clay County rescue squad will be called. For non-emergency situations, the inmates are generally scheduled for the first available appointment at the Clay County Medical Clinic. *See* Def. Ex. 1 at ¶ 5; Ex. 3 at ¶¶ 5-6. It was also the policy of the Jail to provide inmates with any and all medications brought with them to the Jail or prescribed to them during their incarceration. *Id.* Defendants assert that Bailey was familiar with the procedures, as she filled out a medical request form for her cellmate, Kerrie Baker. *See* Def. Ex. 23 at 49. Both Toland and Studdard stated that, to the best of their knowledge, Bailey received care and/or medication every time that she requested it. *See* Def. Ex. 1 at ¶ 5; Ex. 3 at ¶ 5.

Medical Care Received by Bailey While Incarcerated

Bailey was booked into the Jail on November 30, 2999 at 8:30 p.m. by Jailer Joshua
Gregg ("Gregg"). *See* Def. Ex. 16. Bailey signed the booking sheet which indicated that she
had given all information "concerning [her] health during this medical screening." *Id.* Bailey
indicated that she suffered from (1) mental illness, for which she took Xanex and Paxil, (2)
hypertension, (3) back trouble, and (4) a venereal disease (genital herpes). *See* Def. Ex. 17. On
December 1, 1999, Jail staff contacted Bailey's treating physician upon her claim that she was
suffering a panic attack. The medical records reflect that an "okay [was] given to Clay County
jailer for pt [patient] to have additional 1 mg Xanex in event of panic attack per Dr. Chafe." *See*
Def. Ex. 18; Ex. 19. Bailey asserts that she suffered her first panic attack at the Jail, *see* Def. Ex.
24 at 70; however, defendants contend that Bailey had a past medical history of panic attacks.
*See* Def. Ex. 21(a) at page 3 (listing "panic attack" under pastmed/surg column).

Five days later on December 6, 1999, Bailey asked Gregg to arrange for her to see
Investigator Jean Dot Alexander because she could "smell . . . semen" when she urinated. *See*
Def. Ex. 23 at 148-49. Investigator Alexander came to the Jail to meet with Bailey, who stated
that someone had had sex with her. *Id.* at 149.[6] Alexander began an investigation into the
complaint and transported Bailey to the Clay County Hospital. *See* Am. Compl. at ¶ 11; Def. Ex.
23 at 150. The doctors detected semen, as well as bruising on Bailey's shoulder, thigh, and
breasts, and teeth marks on her breasts. *See* Def. Ex. 23 at 150-52.

Bailey contends that she could not remember anything about the incident until the next
day, and she believes that she was drugged because she had no memory and slurred speech. *See*

---

[6]Bailey alleges that she was raped by defendant Frank Threat. This court has previously dismissed all
claims against Toland and Clay County surrounding the alleged rape.

Def. Ex. 23 at 149-50; 158-59.  However, the doctor's notes from Bailey's trip to the emergency

room states "NAD [no apparent distress], alert, speech is clear." *See* Def. Ex. 21(a).  According

to Toland, all of these records are devoid of any mention of Bailey being drugged.  No drug

screening was ordered, and Bailey herself admitted that no one has actually ever told her that she

was drugged. *See* Def. Ex. 23 at 158.[7]

The Clay County Hospital performed a number of tests on Bailey, including a urine HCG

pregnancy test, which was positive, and a rape kit. *See* Def. Ex. 21(a).  Because the urine HCG

test was positive, a serum, or blood HCG test (beta HCG) was also performed.  The result of the

latter test was 1, and defendants contend that any number less than 5 is considered a negative test

for pregnancy. *See* Def. Ex. 27 (expert report); Def. Motion at 31.  As Bailey had already left

the hospital when these results came back, a nurse called the Jail and informed Jailer Leroy

Brown that the test was negative, specifics about Bailey's medication, and that Bailey should see

her "OB doctor ASAP." *See* Def. Ex. 21(a).

Later that same night, at 10:15 p.m., Bailey was readmitted to the hospital to "R/O [rule

out] ectopic pregnancy." *See* Ex. 21(b).  Bailey had an ectopic pregnancy before, prior to her

tubal ligation, and she was concerned that she may have another one because of the alleged rape.

*See* Def. Ex. 21(a).  An ultrasound was performed which found no "evidence of intrauterine

pregnancy identified," although it did not rule out such a possibility because it may have been

too early to tell. *See* Def. Ex. 21(b).  Bailey was told to come back every two days for a

reevaluation, but it was determined on December 10, 1999 that no further treatment was needed.

---

[7]Defendants note that three and one-half months earlier, Bailey apparently thought that she had been
drugged by her estranged husband while they were at dinner together. *See* Def. Motion at 30 n.10.

14

*Id.*, Def. Motion at 32-33.[8]  Defendants assert that the evidence shows that Bailey, even if she

was pregnant, could not have become so as a result of the alleged rape.  *See* Def. Motion at 32.

Bailey states that she miscarried as a result of the alleged assault "six days" after the

alleged incident.  *See* Def. Ex. 24 at 47-48.  She alleges that she told Jailer Jason Gentry and

Jailer Leroy Brown to be taken to the doctor, but that Gentry "ignored" her and that Brown

"snickered at [her] when he walked past and he wouldn't stop."  *Id.*  Defendants counter that

Brown was not on duty on December 11 or December 12, 1999.  Defendants also again contend

that the weight of evidence suggests that Bailey was not ever pregnant, and thus could not have

miscarried.  *See* Def. Motion at 34-35; Def. Ex. 27.  Nor can she show that the problems she

suffered after leaving the Jail are attributable to events that occurred at the Jail.  *See* Def. Br. at

36-37 (discussing cause of Bailey's subsequent surgery, etc.).

Bailey also contends that she began suffering from the flu and requested medical

attention.  *See* Def. Ex. 23 at 52-53.  However, Bailey contends, it was three or four days before

someone took her to the doctor, even though she had been asking for medical care the entire

time.  *Id.*  On December 29, 1999, Bailey was taken to the Clay County Medical Clinic.  Bailey

was prescribed cough medicine, an antibiotic, and anti-nausea medication.  *See* Def. Ex. 25.

According to Jail logs, Bailey took the entire course of cough and antibiotic medicines, but

refused to take the anti-nausea medication.  *See* Def. Ex. 19.

Finally, on January 4, 2000, Bailey was taken to the emergency room with a complaint of

right knee pain.  The medical records indicate that Bailey had a swollen right knee, but that she

refused aspiration of the knee.  *See* Def. Ex. 21(e).  She was given prescription strength Motrin

---

[8]Apparently Bailey refused a request to see her own doctor during this time.  *See* Def. Ex. 22.

and released back to the jail. *Id.*

**III. Procedural Posture**

Bailey filed her original complaint on November 29, 2001, against Clay County, Toland, and defendant Frank Threat.  On March 5, 2002, the court dismissed all state and federal claims against Clay County and Toland in his official capacity.  All state claims were dismissed against Toland in his individual capacity. *See* Docs. 24-25.  Bailey filed an amended complaint against Toland and Threat on March 19, 2002.  On June 24, 2002, the court again dismissed any claims against Toland in his official capacity.  As to his individual capacity, the court allowed Bailey to maintain federal claims for unconstitutional jail conditions (which presumably would include denial of medical care), but not for claims related to the alleged rape. *See* Docs. 39-40.  The rape claims were allowed against Threat, but the court noted that any trial would be bifurcated so that no evidence of the rape could be introduced against Toland. *Id.*

Although Clay County was not named in the amended complaint, the court has allowed Bailey to maintain claims against Clay County for the allegedly unconstitutional jail conditions. The court has continued to adhere to its position that the rape claims may not be brought against any defendant except Threat. *See, e.g.,* Docs. 82-83 (Mem. Op. & Order of May 9, 2003).[9]  Clay County and Toland now seek to have the remaining claims against them dismissed.

**SUMMARY JUDGMENT STANDARD**

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is

---

[9]Bailey included facts concerning the alleged rape in her brief; however, as the rape claim has been dismissed as to Toland and Clay County, the court does not recite those facts here.

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

17

# ARGUMENTS

## I. Motion with Respect to Toland

### A. Defendant's Position

Toland contends that any suit against him in his individual capacity is barred because he is entitled to qualified immunity. As a threshold inquiry, the court must undertake to determine whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "next, sequential step is to ask whether the right was clearly established." *Id.* at 201. Here, the reviewing court determines whether the public official had "notice" or "fair warning" that his conduct would violate the plaintiff's constitutional rights. *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003). Once a defendant has established that he was acting within his discretionary authority, the burden, Toland contends, is on the plaintiff. *See Travers v. Jones*, 323 F.3d 1294, 1295 (11th Cir. 2003).

To show that he was acting under his discretionary authority, a defendant need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)(citation omitted). According to Toland, courts should not be "overly narrow" in interpreting this requirement. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). As one court has noted, "the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear." *Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1998). Here, Toland has met this low hurdle. He was the duly elected Sheriff of Clay County and was charged by law with the administration of

the Jail.

Because he has met this low hurdle, Toland contends, the burden shifts to Bailey. However, she cannot state a Fourteenth Amendment claim with respect to medical care. Toland admits that there can be liability when an officer "shows deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). However, courts have also made it clear that "inadvertent failure to provide adequate medical care" is not a constitutional violation. *Id.* at 105-06. Nor will mere negligence satisfy the standard. *See Wilson v. Seiter*, 501 U.S. 294, 305 (1991).

Regarding medical care, Bailey must meet a two-prong test. First, she must show that, objectively, the denial of medical care was "sufficiently serious." *Wilson*, 501 U.S. at 298. She must also show that, subjectively, Toland acted with a culpable state of mind. *Id.* Stated differently, Bailey must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Here, Toland contends, there is no evidence that any of Bailey's purported conditions were a result of inadequate medical treatment at the Jail. The evidence convincingly shows that Bailey was never pregnant, and even if she was, that she became pregnant before her incarceration. Bailey did have surgery after she was released, but she has presented no evidence connecting the need for the surgery to anything that happened at the Jail. *See* Def. Motion at 36-37. Bailey's own assertions and assumptions will not support her claim. *See* Def. Toland Br. at 5-6 (discussing cases).

Even assuming that Bailey has proven that she had a serious medical need, Toland argues, she has not proven that he was ever aware of that need. As stated by the Supreme Court,

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). There is simply no evidence that Toland had any specific knowledge of one inmate's medical history and/or need for medical attention. *See Williams v. Lee County*, 78 F.3d 491, 493 (11th Cir. 1996)("Plaintiff offered no proof that Chapman in his individual capacity as sheriff of Lee County was causally related to the suicide. There was no evidence that Sheriff Chapman knew anything of Williams' transfer to the jail other than that he had been committed from the EAMC and 'had homicidal tendencies.'").

Lastly, Toland contends, Bailey has offered no proof of deliberate indifference. To the contrary, Toland had instituted policies and procedures which required that inmates be given a health screening upon admission, prompt medical attention upon request, etc. *See* Def. Ex. 1 at ¶¶ 5-6. Here, the uncontroverted evidence is that Bailey was examined by medical providers at least five times between December 6, 1999 and January 4, 2000. If the Jail staff failed to provide Bailey with adequate care, it was against Toland's policies and without his knowledge. *See, e.g., Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)("The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.")(citations omitted); Def. Toland Br. at 8 (other cases).

Next, Toland contends that Bailey has failed to state a claim with respect to jail

20

conditions.  In general, Toland asserts, the Constitution requires only that jail authorities provide the "minimal civilized measure of life's necessities," and it "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 347-49 (1981).  As with medical claims, a plaintiff must show that the jail conditions posed a substantial risk of serious harm and that the officer knew the risk and did not take remedial measures. *See Marsh v. Butler County*, 268 F.3d 1014, 1028-30 (11th Cir. 2001).  Here, Toland contends, Bailey's laundry list of complaints - limited food options, dusty cell, dirty shower, roaming cat, etc. - border on the trivial and clearly did not present a risk of serious harm to her. *See Wilson*, 501 U.S. at 305 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.").  Bailey also cannot assert that <u>other</u> inmates suffered overcrowding, mace spray, etc., when she herself did not.  The one possibly legitimate complaint, the presence of weapons, is not supported by the record, and Bailey lacks standing to allege that weapons <u>could</u> have been made. *See* Def. Toland Br. at 9 n.4.

Even assuming the conditions rose to the level of a constitutional violation, Toland contends, there is no evidence that he was aware that the conditions were putting Bailey at risk.  There is also no evidence that Bailey ever made Toland aware of her specific complaints about the Jail.  Lastly, there is no evidence that Toland was deliberately indifferent to the conditions at the Jail.  Every effort was made to repair problems at the Jail, and Toland encouraged the construction of an alternate facility.

Finally, Toland contends that he is entitled to qualified immunity on the separate ground that his conduct was not clearly established as a violation of the law.  A constitutional right is clearly established if the contours of the right are "sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Eleventh Circuit Court of Appeals has observed that "[q]ualified immunity thus represents the rule, rather than the exception: 'Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.'" *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999)(citation omitted). No clearly established law would have given Toland fair warning that his actions were violating Bailey's constitutional rights.

B. Plaintiff's Response

Bailey counters that a "'qualified immunity ruling . . . is . . . a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.'" *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998)(citation omitted). Here, there are disputed facts as to Toland's testimony[10], medical treatment for Bailey, and the overall condition of the Jail. Since the facts are not undisputed, qualified immunity cannot be applied.

Moreover, qualified immunity is inapplicable, Bailey asserts, because Toland was not acting within his discretionary authority. Discretionary acts are "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Sheth*, 145 F.3d at 1239 (discussing discretionary function immunity under Alabama law). Toland was not acting within his discretionary function when he allowed the Jail conditions to becomes deteriorated. Bailey cites Alabama Code § 14-6-95, which states that

---

[10]Bailey contends that Toland's answers to certain deposition questions were contradicted by later corrections, thus creating an issue of fact. *See* Pl. Br. at 9-11. Toland disputes whether there is any contradiction. *See* Toland Reply. Br. at 6-7.

> The sheriff, chief of police, town marshal or other keepers of jails or prisons or the keeper or manager of the almshouse shall keep their respective jails, prisons and almshouses in a clean and sanitary condition, shall use every means and effort to prevent spitting on the floors and the walls of the jails, prisons and almshouses and shall exercise every precaution to prevent the spread of disease among the inmates.

Bailey asserts that this statute was not followed, as evidenced by the various deductions that the Jail received every time an inspection was done. Bailey also cites Alabama Code § 14-6-97, which states that

> The sheriff, the chief of police or town marshal or the keeper or manager of the almshouse shall see that the food for the inmates of the jail, prison and almshouse, respectively, is nutritious, clean, wholesome and of sufficient quantity and variety and shall have all kitchens where food is prepared for the inmates adequately screened against flies.

Bailey described the food as "nasty," stating that it "would come to you with hair on it and pieces of other dried food that was on it." *See* Def. Ex. 24 at 115. Bailey also stated that the same thing was served every day. Clearly Toland did not have the discretion to violate these statutes.

Bailey also addresses whether the law was "clearly established." To be clearly established, "the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory so that a similarly situated, reasonable government agent would be on notice that his or her questioned conduct violates federal law under the circumstances." *Wilson v. Jones*, 251 F.3d 1340, 1345 (11th Cir. 2001)(citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)(citations omitted). Rather, "a general constitutional rule already identified in the

23

decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Id.* at 741 (citation omitted).

While the rights of prisoners and pre-trial detainees are generally the same, Bailey notes that Eleventh Circuit has held that "[w]hile a sentenced inmate may be punished in any fashion not cruel and unusual, the due process clause forbids punishment of a person awaiting trial but not yet adjudged guilty of any crime." *Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985). The court further reasoned that if "a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 1572. Here, Bailey contends, Toland knew, or at least should have known, of her medical needs. The booking sheet stated that she had back problems, suffered from mental illness, and had hypertension. Bailey also provided the names of all the medications she was taking. The record submitted by defendants, rather than showing that they attended to her needs, actually shows that they were aware that she had medical problems. Bailey contends that the most serious medical conditions resulted from her rape, and the delay by defendants in getting her treated resulted in further complications which surfaced after her incarceration. The delay also exacerbated her previous conditions (i.e., mental illness).

As to the Jail conditions, Toland knew or should have known that they were inadequate, as the regular inspections were addressed to him. *See* Def. Exs. 12-14. These inspection reports clearly state that "time and abuse have severely deteriorated the plumbing, plumbing fixtures, electrical systems, showers, ventilation system and heating systems." *Id.* "Although the United

24

States Constitution does not require comfortable prisons, neither does it permit inhumane ones." *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003). Bailey contends that these inspection reports clearly list problems and conditions that can only be seen as inhumane. *See* Def. Exs. 12-14 (listing, *inter alia*, "Beds to close together to each other. Infectious diseases could be transmitted to other inmates;" "Eliminate Roaches;" and "Clean toilets and showers"). Bailey notes that some of these conditions appear on all three reports. There is also testimony from Bailey that many, if not all, of these conditions affected her directly. *See* Pl. Br. at 18.

Finally, Bailey addresses deliberate indifference. As discussed above, Toland knew or should have known that Bailey was being deprived medical care and that the conditions at the Jail were inhumane. This knowledge supports a finding of deliberate indifference. *See, e.g., Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)("failure to provide prompt attention to serious medical needs by delaying medical treatment for nonmedical reasons constitutes deliberate indifference.")(citation omitted).

C. Defendant's Reply

Toland argues that Bailey has presented no evidence that she suffered a significant injury, that Toland knew about the alleged problems, or that he was deliberately indifferent.

Toland then addresses Bailey's legal arguments. He again notes that the discretionary authority aspect of qualified immunity is "quite a low hurdle to clear." *Godby*, 996 F. Supp. at 1401. Toland also contends that the Eleventh Circuit has rejected arguments similar to those set forth by Bailey (i.e., Toland has no discretion to let the jail deteriorate):

> The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an "untenable" tautology. "Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of

> an official's discretionary duties. The scope of immunity 'should be determined by the relation of the [injury] complained of to the duties entrusted to the officer.'"

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)(citations omitted). Here, Toland was clearly acting within his discretionary authority.

Bailey has also failed to adequately address whether there has been a constitutional violation. She simply restates the allegations in her complaint, and does not address the evidence that proves that she was never pregnant in the first place and that her subsequent surgeries were not the result of her period of incarceration. *See* Def. Ex. 27. The same is true with respect to the prison conditions allegations.

Finally, Toland notes, Bailey has failed to cite what "clearly established law" he violated. The cases cited by Bailey are not remotely similar to the facts of this case. *See* Toland Reply Br. at 5-6. As recently noted by the Eleventh Circuit, "[i]n many--if not most--instances, the apparency of an unlawful action will be established by (if it can be established at all) preexisting caselaw which is sufficiently similar in facts to the facts confronting an officer . . . ." *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003).[11]

## II. Motion With Respect to Clay County

### A. Defendant's Position

Clay County makes almost verbatim the same arguments as Toland, i.e., Bailey cannot show that she had a serious medical need/violative prison condition, that Clay County knew of

---

[11]Bailey filed a reply as well, essentially making the same arguments that were put forth in her responsive brief. Bailey does however, attack the reliability of Toland's expert, *see* Def. Ex. 27, noting that she has not deposed Dr. Sharma, he has not personally examined her, he has only been practicing medicine for six years, etc. *See* Pl. Toland Reply Br. at 3-4. Bailey also notes that these opinions, even if accepted, have no bearing on her jail conditions claims.

that need/condition, or that Clay County was deliberately indifferent to that need/condition. *See*

Def. Clay County Br. at 3-10. As to the claims for medical care, Clay County also cites from

*Marsh*, 268 F.3d at 1014, in which the court analyzed the distinction between claims against an

officer and claims against a county government:

> We address the claims against the County in detail only for the conditions of
> confinement. Plaintiffs also allege deliberate indifference to Owens's serious
> medical needs based on his release. They make this claim against Defendants in
> general, which would seem to include the County. Nothing indicates, however,
> that the County was involved in the alleged deprivation of medical care to Owens.
> Moreover, under Alabama law the County is not responsible for assuring
> procedures are in place for inmates to get medical care. Alabama law assigns
> counties a "limited role in building and funding the jails." *See Turquitt v.
> Jefferson Cty., Ala.*, 137 F.3d 1285, 1290 (11th Cir.1998) (*en banc*). Therefore,
> the County is not a responsible party for the alleged tort of deliberate indifference
> to Owens's medical needs. This claim was properly dismissed against the County.

*Id.* at 1026 n.6. *See also* Def. Clay County Br. at 7 (other cases discussing distinction between

officer and county).

### B. Plaintiff's Response

Bailey concedes that "[t]he duties of the counties with respect to the jails 'are limited to

funding the operation of the jail and to providing facilities to house the jail.'" *Turquitt*, 137 F.3d

at 1289 (citation omitted). However, according to Alabama Code § 11-14-13,

> The county jail must be of sufficient size and strength to contain and keep
> securely the prisoners which may be confined therein and must contain at least
> two apartments, properly ventilated so as to secure the health of those confined
> therein: one for men and one for women.

Here, the Jail was consistently marked for the overcrowding conditions, and at least one of the

inspections noted the inadequate ventilation of the Jail. *See* Def. Exs. 12-14.

In addition, "the Legislature intended to require the county commission to keep a jail and

all equipment therein in a state of repair and to preserve it from failure or decline." *Keeton v.*

*Fayette County*, 558 So. 2d 884, 886 (Ala. 1989)(citing Ala. Code § 11-14-10).  As stated in the

inspection reports, the Jail was in a constant state of decline, creating an unhealthy atmosphere.

*See* Def. Exs. 12-14.[12]  Bailey also cites Alabama Code § 11-12-15(a)(1), which states that

> (a) The following claims are declared to be preferred claims against the county,
> and they shall be given priority in the order named:
>
> (1) Costs of heating the county jail, of supplying it with wholesome water for
> drinking and bathing, of keeping it in a cleanly condition and free from offensive
> odors and of providing it with necessary water closets and dry earth, beds,
> bedding and clothing; fuel; water; light; janitor's services of the courthouse and
> jail; premiums for fire insurance on the public buildings of the county; and
> premiums on surety bonds of public officers where authorized by law to be paid
> by the county.

Here, Bailey argues, Clay County has not supplied the appropriate funds or properly budgeted

for the items stated above.  There are constant reminders about the plumbing system, electrical,

system, etc.  *See* Def. Exs. 12-14.  There are no janitorial services as evidenced by the fact that

inmates clean their own cells.  Clay County has simply not kept the Jail "in a state of repair [or]

preserve[d] it from failure or decline."  *Keeton*, 558 So. 2d at 886.

Finally, Bailey notes, a "local government can be directly responsible for a constitutional

violation due to its acts or omissions."  *Marsh*, 268 F.3d at 1027.  "Therefore, [a] County will

have violated Plaintiffs' Eighth Amendment rights if its failure to maintain the Jail constituted

deliberate indifference to a substantial risk of serious harm to the prisoners."  *Id.*  "Under

Alabama law, a county might be liable when the physical conditions of the jail have deteriorated

---

[12]Bailey cites *Hamm v. DeKalb County*, *supra*, for the "holding" that "states forever can improve the
quality and quantity of the food, living space, and medical treatment that they provide those incarcerated merely by
increasing and properly administering the amount of money they spend on a detention facility." 774 F.2d at 1573.
However, in the very next sentence, the court states: "Thus, a state's decision to maintain at a reasonable level the
quality of food, living space, and medical care <u>rather</u> than improve or increase its provisions of those necessities
<u>serves a legitimate purpose</u>: to reasonably limit the cost of detention." *Id.* (emphasis added).

and pose a serious threat to the safety of inmates and when those conditions have caused the injury to the inmates." *Id.* at 1027 n.7.  Moreover, "it is an unreasonable response for an official to do nothing when confronted with prison conditions--like the conditions alleged in this case--that pose a risk of serious physical harm to inmates." *Id.* at 1034.  "[A]n Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred." *Id.*

Here, Clay County knew or should have known from the health inspection reports that some type of action was desperately needed.  The conditions were present during Bailey's incarceration and were a contributing factor to her injuries.  The inspection reports stated that "large capital outlays will be necessary to achieve acceptable and desirable housing for Clay County inmates." *See* Def. Exs. 12-14.  However, Clay County continually failed to adequately fund the Jail.

## CONCLUSIONS OF THE COURT

The plaintiff continues to persist in aiming at "target" defendant(s) in a case which, initially, was primarily based upon an alleged rape.  She now alleges a variety of physical conditions at the Jail which allegedly caused her constitutional injury other than the alleged rape.  These include:

1. Presence of roaches, lice, spiders
2. Mildew on shower curtain and shower itself; rusty shower
3. Inedible food; lack of variety of food
4. Paint peeling off of walls
5. Water leaking into the electrical system
6. Cat allowed to roam around the Jail (presumably she was allergic, it got into the food, etc.)
7. Guard brought snake to Jail to "terrorize" inmates
8. Material was brought into the Jail from which weapons could be made
9. Overcrowding at the Jail
10. Other plumbing and electrical problems.

The court will first address these argued violations with respect to the County.  It is obvious that numbers 6, 7, and 8 relate to the Jail operations under the authority of the Sheriff, and that there is no basis for holding the County liable therefor.  As to number 1, the evidence is that funds were provided to cover a contract to provide pest control services.  To the extent that these services were not adequately provided by the contractor, the entity responsible for oversight would be the Sheriff, not the County.  Number 2 does not rise to a constitutional level as to any defendant.  The plaintiff has not demonstrated any substantial injury resulting therefrom.  The same is true as to numbers 4, 5, and 10.

The only reasonably (perhaps) arguable bases for liability of the County are as stated in numbers 3 and 9.  Since this court has been continually required to filter through a litany of shotgun claims, it will require additional succinct briefs as to the County directed solely at the issues of the food provisions and overcrowding.  All other purported violations addressed to the County will be stricken.  The plaintiff will brief the two remaining issues within fifteen (15) days.  The County will have ten (10) days to respond.  The plaintiff may reply within seven (7) days.

As to the Sheriff, the court concludes that numbers 1, 2, 4, 5, 6, 7, 8, and 10 are due to be stricken for reasons discussed above.  The court will allow further briefing as to numbers 3 and 9.  The same briefing schedule as outlined above will be followed.  Specific arguments should be made with regard to the relative responsibilities of the Sheriff and the County, what the evidence shows as to the specific cause of any alleged violations, the specific injuries to the plaintiff, etc.  The parties will cite and quote specific case authorities directed at the specific issues.

With regard to the allegedly insufficient medical treatment, there is no substantial

30

evidence that the County was responsible for the provision of medical care at the Jail.  As to the

Sheriff, the parties will brief this issue in the same manner as outlined above.

This _____ day of July, 2003.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**