FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 SEP 16 AM 10: 29

U.S. DISTRICT COURT
N.D. OF ALABAMA

BILLY RENEE BAILEY,                    )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )    Civil Action No.: 01-PT-3047-E
                                       )
CLAY COUNTY, ALABAMA;                  )
RALPH TOLAND, et al.,                  )
                                       )
        Defendants.                    )

ENTERED

SEP 16 2003

**MEMORANDUM OPINION**

This cause comes on to be heard upon supplemental submissions to Clay County,

Alabama's ("Clay County") and Ralph Toland's ("Toland") (collectively "defendants") Motion

for Summary Judgment (Doc. 85), filed on May 21, 2003.[1]  In its July 25, 2003 Memorandum

Opinion, this court ordered plaintiff Billy Renee Bailey ("Bailey") and defendant Toland to brief

the issues of "overcrowding at the jail," "inedible food; lack of variety of food," and medical

care.  This court further ordered defendant Clay County to brief the overcrowding and food

issues.

**FACTS AND PROCEDURAL HISTORY[2]**

Toland was at all relevant times the Sheriff of Clay County, Alabama.  Plaintiff Billy

Renee Bailey ("Bailey") was incarcerated at the Clay County Jail ("the Jail").  This lawsuit

surrounds Bailey's incarceration in the Jail beginning on November 30, 1999.  *See* Def. Ex. 15.

---

[1] Sheriff Toland and Clay County both request awards of attorney's fees and costs in defending this matter "pursuant to 42 U.S.C. § 1488 and other law."

[2] This memorandum opinion restates facts addressed in its July 25, 2003, memorandum opinion regarding overcrowding, food, and medical care at the jail, and adds new facts raised by the parties in their supplemental briefs.

114

Bailey was released on January 18, 2000.  Bailey alleges violations of 42 U.S.C. § 1983 as a

result of unconstitutional conditions at the Jail and denial of medical care while incarcerated.

## I.    Overcrowding at the Jail

Bailey asserts that although the Jail was built to house 24 inmates, at the time of her

incarceration the inmate population was averaging about 61 inmates per day.  She also contends

that the overcrowding problem was reported by local news sources.  Defendants contend that

Bailey herself admitted that often she only had one cellmate, and at times she had the entire cell

to herself.  *See* Def. Ex. 23 at 124, 131.  At one point Bailey did have a cellmate that was present

only on weekends.  *Id.* at 131-32.  At one point Bailey did mention sharing her cell with four or

five other inmates, but that was apparently for one weekend only.  *See* Def. Ex. 24 at 106, 206-

07.  With the exception of one evening in which Bailey was in a cell that had no bunk, she slept

in her own bunk every night.  *Id.* at 205-06.  Bailey was given a mattress and sheets for her bed.

*Id.* at 179.  According to defendants, Bailey never attributed any injury to overcrowding during

her deposition.

In her supplemental brief, Bailey alleges that Toland knew of the overcrowding of the jail

facility based on an August 1999 grand jury inspection in which Toland assisted.  Also, Bailey

notes, Toland admitted to discussing the overcrowding problems with the County Commission

but did not put anything in writing because he wanted to work with the Commission on a

"personal level."  Toland apparently never applied to a judge to rectify the crowding problems.

As to Clay County, Bailey argues, County Commissioner John Wheeles testified to awareness of

the "crowded" condition of the jail in June 1999.  According to Bailey, the County Commission

also knew of the overcrowding problem from a grand jury inspection that informed the County

the problem should be eliminated.

Significantly, Toland contends, the evidence demonstrates that there never were significant or sustained overcrowding problems in the female cells.  Toland testified that from 1998 to 1999 the female inmate population declined over fifty percent [3] but the male inmate population in the male cells increased, particularly in the upstairs cells which housed only male inmates.  Toland further testified that this increase could largely be explained by the presence of state prisoners which the Department of Corrections refused to accept.[4]  Furthermore, Toland argues, he was doing all he could to encourage the Department of Corrections to take these excess inmates.

Similarly, Clay County alleges, County Commissioners like John Wheeles only knew about crowding problems in the upstairs, male-only section of the jail.  *See* Ex. 34, p. 23. According to Clay County, in recognition of its duties to fund new jail facilities or renovate old ones, the County sought more funding for the jails through local acts in Montgomery.  Clay County notes that the County Commission lacks taxing power.  *See* Ex. 34, p. 70.[5]  In the 2000 and 2001 Legislative Sessions, Clay County asserts, the Clay County legislative delegation (at the Commission's request) introduced local acts authorizing the County Commission to impose a cigarette tax, increase court costs, and raise the gasoline tax two cents per gallon in the County,

---

[3] According to Toland, during 1998, 101 female inmates were incarcerated in the Clay County Jail, and during 1999 (the period of Bailey's incarceration), 50 female inmates were incarcerated there.

[4] Health Department Inspector Rusty Miller testified to overpopulation in the upstairs portion of the jail but could not recall any problem with overcrowding in the female cell area.  *See* Ex. 5, ¶ 15.

[5] In 1996 the Commission undertook to finance construction of a new jail, with funding sources to include additional court costs, a two cent gasoline tax, and a tobacco tax.  *Id.*  In Fall 1996, the Commission appointed a Blue-Ribbon Committee comprised of Clay County business leaders to consider how to obtain funds to build a new jail.  *See* Ex. 4, ¶ 6.  An occupational tax proposal on the 1998 ballot failed by a large margin.  *Id.*

3

in order to fund the purchase of the Russell Corporation Building and construction of a new jail. These local acts passed, and the County Commission then imposed the additional taxes and court costs. *See* Ex. 4, ¶ 7.[6]  During the time that the County Commission was working with its legislative delegation to obtain financing for a new jail, funds for ongoing maintenance at the existing Clay County Jail were budgeted as in previous years with increases in each budget. *See* Ex. 34, pp. 109-10.

## II.   Food at the Jail

Bailey described the food at the Jail as "inedible," salty,[7] often containing foreign objects such as human and cat hair and other dried food, and lacking variety ("You were served the same thing every day"). *See* Def. Ex. 24 at 114-16.[8]  Bailey did not like what the Jail was serving and quit eating at one point until a kitchen employee began to make her grilled cheese sandwiches. *Id.* at 118.  She eventually tired of that meal as well. *Id.* at 119.  Bailey contends that another inmate suffered food poisoning, but neither Toland nor Jail Administrator Studdard has ever been made aware of food contamination incidents. *See* Def. Ex. 1 at ¶ 13; Ex. 3 at ¶ 12.[9]  Health Inspector Rusty Miller also stated that he had not been made aware of complaints of contaminated food being served or of food poisoning. *See* Def. Ex. 5 at ¶ 14.

---

[6] In October 2000, the County Commission gave the Chairman and County Administrator authority to negotiate the purchase of the vacant Russell Corporation Building in Ashland, in order that the building could be converted into a new county jail as well as offices for the Sheriff, the adult probation officers, and the County Commission.  An agreement was reached in 2001 and the jail portion of the building was scheduled for completion at the end of July 2003. *See* Ex. 4, ¶ 8.  This court does not know the current status of the jail construction.

[7] Bailey stated that the saltiness of the food was a health risk since she had been prescribed a low-sodium diet by a physician.

[8] Specifically, Bailey stated, she tired of peanut butter and baloney sandwiches.

[9] Toland testified that he had not heard complaints about the food in several years. *See* Ex. 1, ¶ 13; Ex. 3, ¶ 12.

The Jail's policy was to serve inmates three well-balanced meals each day.  The Jail

Administrator placed store orders (including orders for bread, meats, poultry, fish, canned/dried

items, and other general foods/supplies) based upon detailed lists and accounting of the needed

items and the number of those items remaining in storage.  Kitchen trusties prepared the food

and were required to wear hairnets and gloves.  Trays and utensils were gathered after each meal,

when trays were cleaned and rinsed before being placed in a high-steam sanitizer.  *See* Def. Ex. 3

at ¶¶ 13-14.  Cups issued to inmates upon their incarceration could be kept by inmates for use

throughout the day.[10]  The Jail gave inmates soap and detergent to keep their cups clean.  *Id.* at ¶

15.  All meal-time drinks were poured from a common tea or water pitcher into each inmate's

cup.

When Rusty Miller inspected the kitchen in December 1999, it received a rating of 89,

which defendants assert is acceptable.  According to defendants, the few deductions that were

taken had nothing to do with the Jail's food protection measures.  *See* Def. Motion at 25.

Defendants also note that the score of 89 showed improvement from the two previous

inspections, where the kitchen received scores of 87 and 88 on June 2, 1999 and September 29,

1999, respectively.  *See* Def. Ex. 5 at ¶ 13; Exs. 12-14.

During his December 1999 inspection, Miller noted no deficiencies in the following

areas: food, food protection, personnel (hygiene), water, sewage, garbage/refuse disposal, pest

control, kitchen ventilation, dressing rooms, and miscellaneous areas.  Miller found that all food

protection measures such as temperature control, thawing, and storage met the requisite

standards.  Further, the hygiene of the food handlers and preparers, food disposal, and water

---

[10]    Inmates could keep cups from home if they wished.

5

sources met the requisite standards.  The deficiencies noted in Miller's December 1999

inspection involved the tabletop surface upon which foods were prepared, some plumbing

maintenance, broken areas of the floor and wall, and the shielding of light fixtures.[11]  The largest

number of points deleted (4) was based on having no separate locked bathroom facility for each

"trusty" cell.[12]

## III.     Medical Care at the Jail

### A.     The Jail's Medical Care/Medication Policies and Procedures

The Jail's policy is to provide medical attention upon any inmate's written or verbal

request.  In an emergency situation, the inmate will be transported to the emergency room or the

Clay County rescue squad will be called.  For non-emergency situations, the inmates are

generally scheduled for the first available appointment at the Clay County Medical Clinic.  *See*

Def. Ex. 1 at ¶ 5; Ex. 3 at ¶¶ 5-6.  It was also the policy of the Jail to provide inmates with any

and all medications brought with them to the Jail or prescribed to them during their

incarceration.  *Id.*  Defendants assert that Bailey was familiar with the procedures, as she filled

out a medical request form for her cellmate, Kerrie Baker.  *See* Def. Ex. 23 at 49.  Both Toland

and Studdard stated that, to the best of their knowledge, Bailey received care and/or medication

every time that she requested it.  *See* Def. Ex. 1 at ¶ 5; Ex. 3 at ¶ 5.

_____

[11] Consistent with Bailey's allegations, Clay County health reports did mention roaches and the refrigerator temperature at the Jail.  The June, September, and December 1999 health reports all mention eliminating roaches. However, although the June 1999 health report noted the need to repair or replace the refrigerator since it did not operate at the proper temperature, both the September and December 1999 health reports stated: "two refrigerator/freezers have been replaced."  *See* Def. Ex. 12-14.

[12] Health Inspector Miller testified that the bathroom facility is located a few feet down the hallway from the trusty dorm and within ten yards of the kitchen.  According to Miller, the inspection report noted this deficiency because the bathroom facility is not more conveniently accessible within the trusty dorm area itself, and the deduction was made because trusties work in the kitchen.  *See* Ex. 5, ¶ 12.

6

**B.    Medical Care Received by Bailey While Incarcerated**

Bailey was booked into the Jail on November 30, 1999 at 8:30 p.m. by Jailer Joshua

Gregg ("Gregg").  *See* Def. Ex. 16.  Bailey signed the booking sheet[13] which indicated that she

had given all information "concerning [her] health during this medical screening."  *Id.*  Bailey

indicated that she suffered from (1) mental illness, for which she took Xanax and Paxil, (2)

hypertension, (3) back trouble, and (4) a venereal disease (genital herpes).  *See* Def. Ex. 17.  On

December 1, 1999, Jail staff contacted Bailey's treating physician upon her claim that she was

suffering a panic attack.  The medical records reflect that an "okay [was] given to Clay County

jailer for pt [patient] to have additional 1 mg Xanax in event of panic attack per Dr. Chafe."[14]

*See* Def. Ex. 18; Ex. 19.  Bailey asserts that she suffered her first panic attack at the Jail, *see* Def.

Ex. 24 at 70; however, defendants contend that Bailey had a past medical history of panic

attacks.  *See* Def. Ex. 21(a) at page 3 (listing "panic attack" under pastmed/surg column).

Five days later on December 6, 1999, Bailey asked Gregg to arrange for her to see

Investigator Jean Dot Alexander because she could "smell . . . semen" when she urinated.  *See*

Def. Ex. 23 at 148-49.  Investigator Alexander came to the Jail to meet with Bailey, who stated

that someone had sex with her.  *Id.* at 149.[15]  Alexander began an investigation into the

complaint and transported Bailey to the Clay County Hospital.  *See* Am. Compl. at ¶ 11; Def. Ex.

---

[13] A twenty-five question checklist concerning various health issues accompanied this medical statement. A "yes" was marked for history of suicidal tendencies and strange behavior at time of incarceration. Def. Ex. 17.

[14] In her supplemental brief, Bailey notes that on various occasions her requests for medication were denied. On one particular occasion, Bailey alleges, she asked her jailer, defendant Frank Threat, to bring her Aleve for fever, but he raged and reached for his mace. There is no evidence that Toland was aware of the incident.

[15] Bailey alleges that she was raped by defendant Frank Threat. This court has previously dismissed all claims against Toland and Clay County concerning the alleged rape.

23 at 150.[16]  The doctors detected semen, bruising on Bailey's shoulder, thigh, and breasts, and

teeth marks on her breasts.  *See* Def. Ex. 23 at 150-52.

Bailey contends that she could not remember anything about the incident until the next

day, and she believes that she was drugged because she had no memory and slurred speech.  *See*

Def. Ex. 23 at 149-50; 158-59.  However, the doctor's notes from Bailey's trip to the emergency

room stated: "NAD [no apparent distress], alert, speech is clear."  *See* Def. Ex. 21(a).  According

to Toland, all of these records are devoid of any mention of Bailey being drugged.  No drug

screening was ordered, and Bailey herself admitted that no one has actually ever told her that she

was drugged.  *See* Def. Ex. 23 at 158.[17]

The Clay County Hospital performed a number of tests on Bailey, including a urine HCG

pregnancy test, which was positive, and a rape kit.  *See* Def. Ex. 21(a).  Because the urine HCG

test was positive, a serum, or blood HCG test (beta HCG) was also performed.  The result of the

latter test was 1, and defendants contend that any number less than 5 is considered a negative test

for pregnancy.  *See* Def. Ex. 27 (expert report); Def. Motion at 31.  As Bailey had already left

the hospital when these results came back, a nurse called the Jail and informed Jailer Leroy

Brown that the test was negative, specifics about Bailey's medication, and that Bailey should see

her "OB doctor ASAP."  *See* Def. Ex. 21(a).

Later that same night, at 10:15 p.m., Bailey was readmitted to the hospital to "R/O [rule

_____

[16] Toland denies any delay in transporting Bailey to a physician after she reported her alleged rape on
December 6, 1999.  Citing excerpts from Bailey's first deposition, Toland contends that Alexander's "investigation"
consisted of asking the question "what happened," to which Bailey responded "someone had sex with me."
Immediately afterward, Toland contends, Bailey was transported to the hospital.

[17] Defendants note that three and one-half months earlier, Bailey apparently thought that she had been
drugged by her estranged husband while they were at dinner together.  *See* Def. Motion at 30 n.10.

out] ectopic pregnancy." *See* Ex. 21(b). Bailey had an ectopic pregnancy before, prior to her

tubal ligation, and she was concerned that she may have another one because of the alleged rape.

*See* Def. Ex. 21(a). An ultrasound was performed which found no "evidence of intrauterine

pregnancy identified," although it did not rule out such a possibility because it may have been

too early to tell. *See* Def. Ex. 21(b). Bailey was taken back to the hospital on December 8 and

10 for follow-up HCG tests, but it was determined on December 10, 1999 that no further

treatment was needed. *Id.*, Def. Motion at 32-33.[18] The December 10th test confirmed she was

not pregnant. Defendants assert that the evidence shows that Bailey, even if she was pregnant,

could not have become so as a result of the alleged rape. *See* Def. Motion at 32.

Bailey states that she miscarried "six days" after the alleged assault. *See* Def. Ex. 24 at

47-48. She further alleges that Jailers Jason Gentry and Leroy Brown refused her request to be

taken to the doctor after she noticed spotting; instead, Gentry "ignored" her and Brown

"snickered at [her] when he walked past and he wouldn't stop." *Id.* Defendants counter that

Brown was not on duty on December 11 or December 12, 1999. Defendants also again contend

that the weight of evidence suggests that Bailey was not ever pregnant, and thus could not have

miscarried. *See* Def. Motion at 34-35; Def. Ex. 27.[19] Furthermore, Defendants contend, Bailey

---

[18]Apparently, on December 7, 1999, Bailey's general physician asked that she be transported to Dadeville for an examination. While the jail staff was prepared to facilitate this request, Toland contends, Bailey refused to go. *See* Def. Ex. 22.

[19] Toland relies upon medical testimony provided by Dr. Lee Sharma, a board-certified gynecologist practicing in Alabama. After examining Bailey's medical records, Dr. Sharma concluded that Bailey most likely was never pregnant, never suffered a miscarriage, and experienced any subsequent problems because of a pre-existing disease rather than anything that happened at the Clay County Jail. *See* Def. Ex. 27, p. 1 of Affidavit, pp. 5-6 of Report.

Bailey previously attacked Dr. Sharma's opinion, noting that she had not deposed Dr. Sharma, Dr. Sharma never personally examined her, and the doctor had only been practicing medicine for six years, etc. Bailey also noted that Sharma's medical opinions, even if accepted, have no bearing on her jail conditions claims. *See* Pl. Toland Reply Br. at 3-4.

cannot show that the problems she suffered after leaving the Jail are attributable to events that occurred at the Jail. *See* Def. Br. at 36-37 (discussing cause of Bailey's subsequent surgery, etc.).

Bailey also contends that she began suffering from the flu and requested medical attention. *See* Def. Ex. 23 at 52-53.  However, Bailey contends, it was three or four days before someone took her to the doctor, even though she had been asking for medical care the entire time.  *Id.*  On December 29, 1999, Bailey was taken to the Clay County Medical Clinic.  Bailey was prescribed cough medicine, an antibiotic, and anti-nausea medication. *See* Def. Ex. 25. According to jail logs, Bailey took the entire course of cough and antibiotic medicines but refused to take the anti-nausea medication. *See* Def. Ex. 19.  According to Toland, on December 29, 1999, Bailey complained of flu and was examined by Dr. Hensleigh of the Clay County Medical Clinic.  No evidence indicates Bailey complained to Hensleigh of having flu symptoms for several days or suspecting a miscarriage.

Finally, on January 4, 2000, Bailey was taken to the emergency room with a complaint of right knee pain.[20]  Medical records show that Bailey refused aspiration of her knee, which was swollen with "joint fluid." *See* Def. Ex. 21(e).  She was given prescription strength Motrin and released back to the jail with a final diagnosis of arthritis. *Id.*  Toland contends that Bailey made no other medical requests or complaints until the time of her release on January 18, 2000. *See* Ex. 5.

Bailey contends that all these requests were only made to jailers because defendant

_____

[20] On this occasion, Bailey alleges, she was denied medical treatment for her knee injury for three to four days.

10

Toland refused to see her after she made several requests for a conference with him.  Bailey

testified, "[W]hen you asked to be taken to the doctor . . . they wouldn't take you or they would

ignore me.  When you asked why was your medication late, they would ignore you."  Bailey

admitted she never talked to Toland personally.  Toland testified that he never received any

verbal or written complaint from Bailey concerning any condition within the jail that was

causing her to suffer, including any alleged denial of medical treatment.  Toland did learn about

the alleged rape soon after it supposedly occurred.

**IV. Procedural Posture**

Bailey filed her original complaint on November 29, 2001, against Clay County, Toland,

and defendant Frank Threat.  On March 5, 2002, the court dismissed all state and federal claims

against Clay County and Toland in his official capacity.  All state claims were dismissed against

Toland in his individual capacity.  *See* Docs. 24-25.  Bailey filed an amended complaint against

Toland and Threat on March 19, 2002.  On June 24, 2002, the court again dismissed any claims

against Toland in his official capacity.  As to his individual capacity, the court allowed Bailey to

maintain federal claims for unconstitutional jail conditions (which presumably would include

denial of medical care), but not for claims related to the alleged rape.  *See* Docs. 39-40.  The rape

claims were allowed against Threat, but the court noted that any trial would be bifurcated so that

no evidence of the rape could be introduced against Toland.  *Id.*  Additionally, the court allowed

Bailey to maintain federal claims for alleged unconstitutional jail conditions against Clay

County.

On July 25, 2003, the court issued a memorandum opinion striking most of the violations

alleged by Bailey, except for overcrowding, food, and medical care.  As to Toland, the court ordered

11

defendant to brief all three alleged violations. As to Clay County, the court ordered briefing on overcrowding and food (as the only possible bases for Clay County's liability).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th

Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.    General Legal Observations

Bailey observes that the public is responsible for prisoner care because prisoners cannot care for themselves. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976)(citation omitted). Regarding county jails, the county's duty is limited to providing facilities and funding the operation of the jail. *See Turquitt v. Jefferson County Alabama*, 137 F.3d 1285, 1289 (11th Cir. 1998)(citation omitted).[21] Bailey argues, "A local government can be directly responsible for a constitutional violation due to its acts or omissions." *Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1026 (11th Cir. 2001). Furthermore, Bailey contends, a sheriff's legal duties are founded upon "the legal custody and charge of the jail in his county and all prisoners committed thereto, except in cases otherwise provided by law, and may appoint a jailer for whose acts he is civilly responsible." *See Ala. Code* ¶ 14-6-1(1975). As such, Bailey argues, Sheriff Toland "is responsible for the more specific jail conditions that the Court has found attributable to him."[22]

The Alabama Code, Bailey concludes, intended that county commissioners and sheriffs be responsible for their actions. According to Bailey, neither defendant followed Alabama statutory

---

[21] Plaintiff relies upon *Hamm v. Dekalb County*, 774 F.3d 1567, 1573 (11th Cir. 1985) for the following: "[I]t has also been held that governments can always improve the food, living conditions, and medical treatment at these detention facilities by increasing the funds for those facilities." As noted in this court's July 25, 2003 Memorandum Opinion, *Hamm* also stated: "Thus, a state's decision to maintain at a reasonable level the quality of food, living space, and medical care <u>rather</u> than improve or increase its provisions of those necessities <u>serves a legitimate purpose</u>: to reasonably limit the cost of detention." *Id.*

[22] The court does not recall any such specific "findings."

law, and each defendant is liable. Bailey observes that "the conditions for which the Defendants are responsible are intertwined. For example, the overcrowded condition has likely contributed to the inattention to the medical and nutritional needs of the inmates – there were simply too many prisoners for the limited staff that was provided."

Defendant Clay County observes that the Constitution only requires jail authorities to provide the "minimal civilized measure of life's necessities . . . . [not] comfortable prisons." *See Rhodes v. Chapman*, 452 U.S. 337, 347-49 (1981). Further, Clay County contends, deprivations must be "sufficiently grave" to rise to the level of Eighth (or Fourteenth) Amendment violations. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). According to Clay County, Bailey has not shown that she was denied the minimal necessities of civilized life or that she experienced anything more than discomfort (if that) due to the Jail's alleged overcrowding and inadequate food service. Moreover, Clay County contends, Bailey has demonstrated no deliberate indifference on the part of Clay County. Finally, Clay County argues, even if it is true that governments can improve food and living condition in jails by increasing funds for them, "it does not follow that the failure to perpetually increase funding equates to a constitutional violation." *See* Def. Supp. Brief at p. 2, relying upon *Hamm v. DeKalb County*, 774 F.2d 1567, 1573 (11th Cir. 1985).

## II.   Overcrowding at the Jail

### A.   Bailey's Position

#### 1.   Liability of Clay County

First, Bailey reminds this court of its observation that Clay County can be held liable for jail

14

overcrowding.[23] Bailey relies upon Alabama Code §§ 14-6-103 and 11-14-13 regarding county jails:

> Each county jail or town or city prison must be of sufficient size and
> strength to contain and keep securely the prisoners confined therein and
> must contain separate apartments for men and women . . . .

> The county jail must be of sufficient size and strength to keep securely the
> prisoners which may be confined therein and must contain at least two
> apartments, properly ventilated so as to secure the health of those confined
> therein: one for men and one for women.

Housing excessive numbers of inmates, *see Nicholson* at 308, or having prison conditions

that result 'unquestioned and serious deprivation of basic human needs,'" *see Johnson v. U.S.*, 816

F. Supp. 1519, 1523 (N.D. Ala. 1993)(citation omitted), constitutes cruel and unusual punishment.

Bailey notes that jail health reports had admonished Clay County to eliminate overcrowded

conditions and raised the issue of "[b]eds too close together."  Moreover, Bailey argues, Clay

County should have been aware of the alleged unconstitutional jail conditions due to the various

established reporting methods.  The Department of Corrections must inspect the jails to secure

justice, humanity, and economic management.  *See Turquitt* at 1289.  Likewise, the County was

required to stay informed about conditions within the jail, as reflected in the statutory mandate

regarding county health officers. *Id.* at 1290.[24]  Pursuant to its rights, Bailey notes, Clay County

---

[23] The July 25, 2003, memorandum opinion stated: "The only reasonably (perhaps) arguable basis for
liability of the county are as stated in numbers 3 (food) and 9 (overcrowding)."

[24] Pursuant to Ala Code ¶ 22-3-5(3)(1975), county health officers must:

> [V]isit all jails . . . and . . . make careful investigation as respects the drinking
> water, food, clothing, and bedding supplied to prisoners and as to the ventilation,
> air space, heating and bathing facilities, drainage, etc., of these institutions; and
> when any of said supplies are found to be inadequate in quantity or deficient
> in quality or any said conditions unsanitary, the county health officer shall make
> in writing a report thereof to the . . . county commission or the proper municipal
> authorities, as the case may be.  [These same parties] shall carry out whatever
> recommendations are made by the county health officer . . . .

15

inspected the county jail. Alabama law also imposes a duty on the County Commission to appropriate money for the county jail and to order the issuance of a warrant payable to the sheriff regarding this appropriation. *See* Ala. Code ¶ 11-14-20.

Specifically, Bailey points to Commissioner Wheeles's awareness of the "crowded" conditions at the Clay County jail, as well as Clay County's awareness stemming from a 1999 grand jury inspection and previous discussions among Commission members.

### 2.    Liability of Toland

Bailey cites from the Alabama Code:

> If the jail of any county is destroyed, or becomes insufficient or unsafe, or any epidemic dangerous to life is prevalent in the vicinity or there be danger of rescue or lawless violence to any prisoner, any circuit court judge may, on the application of the sheriff and proof of fact, direct the removal of any prisoner or prisoners to the nearest sufficient jail in any other county; and it is the duty of such judge, in such case, to make an endorsement on the order or process of commitment, stating the reason why such removal is ordered, and to date and sign such endorsement.

Ala. Code § 14-6-7(1975). Although Sheriff Toland knew of the overcrowding problem at the jail, Bailey asserts, he did not attempt to put the issues in writing because he wanted to work with the Commission on a "personal level." No evidence suggests that Toland petitioned a judge to rectify this condition.

### B.    **Toland's Position**

Sheriff Toland emphasizes Bailey's failure to connect overcrowding in the male inmates' section of the jail with her own constitutional rights. Even if Bailey proved part of the jail was exceeding its design capacity, Defendants argue, that fact does not mean Bailey herself suffered a constitutional deprivation. Plaintiffs do not have standing to assert other inmates' claims, Toland contends. *See, e.g., Bass v. Singletary*, 143 F.3d 1442, 1446 (11ᵗʰ Cir. 1998); *Weaver v. Wilcox*, 650

16

ery long

needs, Clay County contends, *Farmer* rejected that understanding and required a subjective component. *See Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996). According to Clay County, County Commissioners like Commissioner Wheeles were only aware of overcrowding in the male section of the Clay County Jail.[27]

Moreover, Clay County argues, the Commission's concrete actions in responding to the problem – seeking to enhance revenue through local acts, appointing a Blue Ribbon Committee of business leaders to study the problem, authorizing the purchase of the Russell Corporation Building as a new county jail – demonstrate "anything but" deliberate indifference. In light of this evidence, Clay County contends, Bailey has created no genuine issues of fact as to whether she suffered injuries stemming from overcrowding in other parts of the jail, whether Clay County knew of any such injuries, and whether Clay County was deliberately indifferent to her situation.

## III.   Food at the Jail

### A.    Bailey's Position

Bailey recounts specific problems she encountered with jail food and specific problems with the condition of the kitchen, as revealed by health reports.[28] On the issue of Clay County's liability, Bailey argues, Alabama law mandates: "[t]he county commission of each county shall supervise the feeding of all prisoners in the county jails over which it has jurisdiction." *Ala. Code* § 14-6-41(6)(1975). Furthermore, Bailey argues, "[t]he failure to properly prepare and serve nutritionally

---

[27] Clay County observes that a constitutional violation does not necessarily follow from excess capacity; instead, courts consider whether the overcrowding led to deprivation of food, medical care, or sanitation. *See Rhodes v. Chapman*, 452 U.S. 337, 348 (1982)(finding no Eighth Amendment violation in a situation where "double celling made necessary by the unanticipated increase in prison population . . . neither . . . [led] to deprivations of food, medical care, or sanitation . . . [n]or . . . increase[d] violence among inmates or create other conditions intolerable for prison confinement."

[28] These facts are addressed earlier in this Memorandum Opinion.

adequate food to inmates who are unable, due to their confinement, to seek alternative sources of nutrition constitutes a violation of the inmates' Eight and Fourteenth Amendment rights." *See Nicholson v. Choctaw County, Alabama,* 498 F. Supp. 295, 309 (S.D. Ala. 1980).

Regarding Toland's liability, Bailey contends, the foundation of a sheriff's duties is the legal custody and charge of his jail and its prisoners. *See* Ala. Code § 14-6-1 (1975). Moreover, Bailey contends, Sheriff Toland is charged with feeding (whether in person or through a jailer) prisoners in the jail under his jurisdiction, *see* Ala. Code ¶ 14-6-40 (1975), and "shall see that the food for the inmates of the jail . . . is nutritious, clean, wholesome and of sufficient quantity and variety and shall have kitchens where food is prepared for the inmates adequately screened against flies." *Ala. Code* § 14-6-97 (1975). The lack of variety of food at the Jail, Bailey argues, violated this statute.

### B.   Toland's Position

Despite Bailey's allegation that another inmate suffered from food poisoning, Toland asserts, neither Toland, the jail administrator, nor Health Inspector Miller were aware of any such incident. Toland testified that he had heard no complaints about food for several years. *See* Ex. 1, ¶ 13; Ex. 3, ¶ 12. Toland cites facts mentioned earlier in this memorandum opinion regarding food service and preparation in the jail and health/sanitation measures. Toland realleges that the December 22, 1999 kitchen inspection score of 89 demonstrated improvement over the prior two inspections. Toland contends that Bailey's food-related complaints do not rise to the level of a constitutional claim or prove deliberate indifference. *See Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (1985) ("The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation.") Furthermore, Toland contains, there is no proof that Toland personally knew of Bailey's food-related complaints and Bailey has not

identified clearly established law which would have put Toland on notice that his conduct (regarding Bailey's food complaints) was unconstitutional.

### C.    Clay County's Position

Clay County adopts and incorporates Toland's supplemental arguments, including Toland's reliance on the *Hamm* case and Toland's detailed account of the Jail's enforced policies to ensure adequate food service and health measures.    Additionally, Clay County argues, Bailey never demonstrated that Commissioner Wheeles was aware of alleged food problems in the jail, so plaintiff has not made a case for deliberate indifference.

### IV.    Medical Care at the Jail

### A.    Bailey's Position

Bailey cites Alabama Code § 14-6-9:

> When the life or health of any prisoner, who is not confined under process from any court of the United States, may be seriously endangered by longer confine- ment in jail and that fact is made to appear clearly to any circuit court judge, such judge must, by an order in writing, direct the sheriff or jailer to remove him to some suitable place or hospital, as near as may be to the jail, and there safely to keep him until his health is sufficiently restored to authorize his recommitment to jail.

This statutory provision also requires the sheriff or jailer to provide "necessary medicines and medical attention to those who are sick or injured, when they are unable to provide for themselves." *Id.*

Bailey contends that Toland violated both her Eighth and her Fourteenth Amendment rights. Bailey notes that these two amendments place limitations on the "treatment and conditions that states impose on prisoners." *See Hamm* at 1571.    Importantly, Bailey asserts, the minimum standards for providing medical care and basic necessities to pre-trial detainees and convicted

prisoners are the same. *See Lancaster v. Monroe County, Alabama*, 116 F.3d 1419, 1425 (11th Cir. 1997); *Hamm* at 1574. However, Bailey contends, pre-trial detainees have some rights that inmates do not have: "While a sentenced inmate may be punished in any fashion not cruel and unusual, the due process clause forbids punishment of a person awaiting trial but not yet adjudged guilty of any crime." *Hamm* at 1572. If a condition is not reasonably related to a legitimate goal, i.e., is arbitrary or purposeless, a court may infer that the purpose of the governmental action is "punishment" that may not be inflicted upon detainees. *Id.* at 1573. Furthermore, Bailey argues, "it is an unreasonable response for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates." *Marsh* at 1034. Bailey notes generally that Alabama law gives the sheriff control over inmates, jail employees, and the jail. *See Ala. Code* § 14-6-1 (1975).

Despite Toland's deposition testimony to the contrary,[29] Bailey argues, Toland knew or should have known of Bailey's medical needs, since Toland required her to provide information about her medical history and current medications during the initial booking process. The initial booking sheet included her medical conditions, e.g. "back problems," "hypertension," and "mental illness," her medications, e.g., Xanax and Paxil, and a twenty-five question checklist that revealed Bailey's history of mental illness, suicidal tendencies, and strange behavior at incarceration. Toland's extensive submission of Bailey's medication logs, Bailey contends, actually supports the

---

[29] Toland's deposition stated:

*Q: What about, do you know whether or not Ms. Bailey asked for medical attention during the course of the time she was there; and during the course of time she said she had a mis-carriage, whether she asked for medical care that she didn't get?*
*A: I don't have any – any knowledge of that.*

*See* Pl. Supp. Brief, Attach. B.

inference that Toland had full knowledge of Bailey's substandard medical conditions.

Bailey argues that the most important medical condition she suffered in jail and the condition "that could possibly be the most severe with respect to long-term physical, psychological and emotional trauma producing irreparable harm" was her alleged rape. Her alleged rape, Bailey contends, "presented the Defendant with a situation of the utmost importance and one where time was of the essence to see that [I] received the appropriate medical attention." By subjecting her to interrogation instead of immediately addressing her physical needs, Bailey argues, Toland delayed the urgent need for treatment. According to Bailey, this untimely delay exacerbated the medical conditions she suffered upon admittance to the Clay County Jail and resulted in the development of additional medical conditions after her release.[30]

Bailey admits that she must allege at a minimum that Toland acted with "deliberate indifference" to her medical conditions. *See Wilson v. Seiter*, 111 S. Ct. 2321 (1991).[31] When considering a "deliberate indifference" claim, Bailey contends, courts should consider whether the official knew of the plaintiff's need for medical care.[32] Additionally, Bailey argues, plaintiff's showing that a doctor took the "easier and less efficacious route in treating an inmate" or that medical care was delayed or denied would be sufficient to prove deliberate indifference to the inmate's health and safety. *See McDuffie v. Hopper*, 982 F. Supp. 817, 826 (M.D. Ala.

_____

[30] The court adheres to its previous position that it will not admit any evidence related to the alleged rape against Toland or the County. The medical attention in that regard was certainly not indifferent. Persistence in pursuing this claim against Toland does not add to its validity.

[31] *Wilson* further held that "only those deprivations denying 'the minimum civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 298 (citation omitted).

[32] Bailey quotes from Justice White's concurrence in *Wilson*: "[a]n express intent to inflict unnecessary pain is not required."(citation omitted). Justice White concurred in the judgment, not the opinion.

1997)(citation omitted).  Furthermore, Bailey argues, "grossly incompetent, inadequate, or excessive [medical care] as to shock the conscience or to be intolerable to fundamental fairness," has been held to violate the Eighth Amendment.  *See Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

Bailey adds that "failure to provide prompt attention to serious medical treatment for non-medical reasons" constitutes deliberate indifference. *Lancaster* at 1425.[33]  Bailey repeats her factual contentions that medication and treatment were delayed at various times during her incarceration.[34]

## B.   Toland's Position

Bailey's complaint, Toland states, alleged Toland's failure "to provide adequate medical care to the Plaintiff when she miscarried a few days [after becoming pregnant], resulting in serious consequences to her health [and] [s]everal months later, she underwent surgery as a result of health

---

[33] On the issue of delay, Bailey relies upon *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994, which indicated that delay in medical treatment is a primary factor in considering the seriousness of an inmate's medical needs.  This court notes that *Hill* also stated:

> Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious."  An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.  Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay (Emphasis added).  Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay.

(Citations omitted). *Id.* at 1188.

Furthermore, this court notes, *Hill* defined a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* at 1187 (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)).

[34] Bailey alleges that Jailer Threat refused to provide Aleve for her fever when she asked, Jailer Gentry refused to take her to the doctor when she miscarried, jailers waited three to four days before taking her to the doctor for the flu, and jailers waited three to four days before taking her to the doctor for her injured knee.  According to plaintiff, she only went to jailers with these requests because Toland refused to see her.

problems created thereby." Toland argues that he is entitled to summary judgment for the following three reasons:[35] (1) Bailey offered no competent medical evidence that she was pregnant, miscarried, or suffered "any serious consequences to her health" as a result of her incarceration at Clay County Jail; (2) Bailey offered no evidence or legal authority to justify a finding that Toland was "deliberately indifferent" to a serious medical need (even if Bailey could prove she had one); and (3) Bailey offered no "clearly established law" sufficient to deprive Sheriff Toland of qualified immunity.

Addressing the first reason, Toland argues that Bailey has not "set forth evidence of an objectively serious medical need." *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). On the other hand, Toland argues, defendants have offered competent medical testimony by a board-certified gynecologist (Dr. Sharma) that Bailey was most likely never pregnant, never miscarried, and experienced any subsequent problems due to a pre-existing disease rather than what happened at Clay County Jail. According to Toland, Bailey has not refuted Dr. Sharma's opinions.

Addressing the second reason, Toland recounts facts concerning medical attention Bailey received in jail.[36] Toland emphasizes that Sheriff Toland, sued in his individual capacity, can be held liable only for actions he took or policies he instituted. *See Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir. 1992)("Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability.") Rather, Toland argues, policymakers and supervisors are liable only when "there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *See Belcher v. City of Foley*, 30 F.3d 1390, 1396-97 (11th Cir.

---

[35] The first two reasons, Toland argues, are relevant to his qualified immunity claim.

[36] These facts are addressed earlier in this Memorandum Opinion.

24

1994)(citation omitted).   Indisputably, Toland asserts, Toland had no interaction or personal involvement with Bailey,[37] and Bailey has not challenged Toland's policies.  Furthermore, Toland argues, Bailey's contention that Toland can be personally liable for facts he did not know but "should have known" contradicts the U.S. Supreme Court's *Farmer* standard (requiring subjective knowledge on the part of the official).[38]

Even if Toland could be held liable on the medical care issue, Toland contends, Bailey received care far exceeding constitutional requirements.  In support of this contention, Toland repeats facts about Bailey's in-take assessment and prescribed medication.[39]  After Bailey's alleged rape, Toland notes, no evidence indicates a delay in getting her to a physician.  Rather, Bailey has testified that Inspector Jean Dot Alexander took her to the hospital right after their meeting concerning the alleged rape.  Toland also provides evidence about Bailey's multiple hospital and physician visits after the alleged December 6, 1999 rape.[40]  Incidentally, Toland contends, while Bailey's supplemental brief briefly touched upon "back problems," "hypertension," "mental illness," and "suicidal tendencies," she has not developed arguments about these conditions.[41]

Finally, on the qualified immunity issue, Sheriff Toland adopts and incorporates the citations contained in his previous summary judgment submissions and argues that Bailey has not cited legal

---

[37] These facts are addressed earlier in this Memorandum Opinion.

[38] Toland testified as follows: Plaintiff's Complaint was his first indication of Bailey's problems with jail conditions, Bailey neither wrote nor spoke to him about jail conditions or denial of medical treatment while she was in jail, and if any of the inmates had concerns about basic sanitation or comfort, they weren't telling him about it.

[39] These facts are addressed earlier in this Memorandum Opinion.

[40] These facts are addressed earlier in this Memorandum Opinion.

[41] According to Toland, these additional conditions are not contained in the Complaint, were not proven to be serious medical concerns, and were never connected to Sheriff Toland.

authority to justify denying him qualified immunity.[42]

## CONCLUSIONS OF THE COURT

The court, after further consideration, concludes that there is not sufficient evidence to establish liability of Clay County for unconstitutional overcrowding or food service. There is no substantial evidence that the plaintiff herself suffered any injury as a result of either overcrowding or inadequate food service. Plaintiff was incarcerated for slightly over one and one-half months. Her primary complaint resulted from the alleged rape and the other claims against Clay County appear to be merely attempts to avoid abandonment of her unfounded rape claim against Clay County as opposed to the alleged culprit. All claims against Clay County will be dismissed, with prejudice.

For similar reasons, the overcrowding and food service claims against Toland will be dismissed, with prejudice. Further, the court concludes that the deliberate indifference to medical needs claims against Toland are due to be dismissed either because of lack of knowledge by Toland or because of qualified immunity. In addition, there appears to be insufficient evidence of serious medical needs other than as related to the alleged rape for which plaintiff received prompt attention. It appears that plaintiff has merely attempted to add lagniappe to what may be a serious rape claim in order to aim for target defendants.

This ___15___ day of September 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[42] Toland relies generally upon *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003).

26